C. E. King v. Commissioner. Juanita M. King v. Commissioner.
King v. Commissioner
Docket Nos. 23042, 23043.
United States Tax Court
1950 Tax Ct. Memo LEXIS 260; 9 T.C.M. (CCH) 136; T.C.M. (RIA) 50046; February 28, 1950
*260 Held: That in the year 1946 petitioners held certain houses, sold in that year, primarily for sale to customers in the ordinary course of business. Homer L. Bruce, Esq., 1617 Niels Esperson Bldg., Houston 2, Tex., and Robert K. Jewett, Esq., for the petitioners. A. T. Akin, Esq., and Joseph P. Crowe, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $6,691.23 and $6,945.57 in the income tax liabilities of the petitioners, C. E. King, hereinafter called petitioner, and Juanita M. King, respectively, for the year 1946. The only issue is whether or not a gain realized on the sale of 49 houses in the taxable year is taxable as ordinary income or as capital gain. The case is submitted upon the pleadings and the oral and written evidence. Findings of Fact Petitioners at all times material hereto were citizens of Texas and their property and income were community. J. L. Martin Investment Company, hereinafter sometimes referred to as the Company, was incorporated under the laws of Texas in April, 1942. In the latter part of 1942 petitioners acquired 50 per cent of its stock and the remaining *261 50 per cent in June or July, 1945. At the beginning of and during the war there were a large number of large plants located at Texas City, Texas, of vital importance to the prosecution of the war with a great need for war workers but with no housing for them. The Federal Housing Authority (F.H.A.) held a series of meetings with builders, explained the method of financing under Title VI of the National Housing Act and the need for war housing, and urged builders to construct houses for rental purposes. These workers were generally transients with no means for buying houses. Such war housing projects were constructed and financed as follows: A corporation would be formed and make arrangements with a private lender to loan it the necessary money up to 90 per cent of the appraised value of the proposed project, with F.H.A. insuring the loan. A proposed project would be submitted to F.H.A. and after the plans and appraisals had been approved by it, the lots would be bought, the houses constructed and the financing done through F.H.A. insured financing. The J. L. Martin Investment Company constructed 320 houses in the Texas City project on this basis, in two lots, the first of 50 houses *262 and the second of 270 houses. The 50 houses were in one large single project and the other 270 houses in another a few blocks away. They were not scattered over Texas City. As construction materials in 1942 and 1943 were all under priorities, it was necessary for the Company to get priorities from the War Production Board, which was done. In its applications for priorities the Company agreed that the 320 houses would be constructed for rental purposes. The 320 houses were built in 1942 and 1943. After the plans for the lot of 270 houses had been approved by F.H.A. in the latter part of 1942, petitioners purchased 50 per cent of the stock of J. L. Martin Investment Company and C. E. King (petitioner) became president. The Company constructed the 270 houses and all 320 houses were rented. In July, 1945, petitioners bought the other 50 per cent of the stock, the Company was liquidated, and all of the assets of the Company, including 291 of the houses then owned by the Company were transferred to petitioners, 29 houses having been sold by the Company theretofore. In 1945 petitioners sold two of the houses. In 1946, after the home purchasing program for war veterans went into *263 effect, petitioners sold 49 of the houses. All the houses had, at the time of sale, been owned by petitioners more than six months since their acquisition by petitioners on August 30, 1945, except one, as to which the parties agreed that the profit attributable to it was $1,723 and is taxable as ordinary income. Petitioner has owned minority stock interests in two or three corporations engaged in subdividing and selling property. His business has been at all times real estate and the handling of rental property. Petitioner has never had a real estate broker's license. On October 19, 1949, petitioner still owned approximately 120 of the 291 houses obtained on the liquidation of the J. L. Martin Investment Company. Certain of the houses built by the J. L. Martin Investment Company under priority were rented with an option to purchase. After petitioner became president of the J. L. Martin Investment Company on January 1, 1943, a letter dated June 21, 1943 was addressed to the occupants of such houses by the Company stating: "It is our desire to sell the property and we would be glad to have you exercise your option." A followup letter was addressed to the same parties in which *264 it was stated: "In as much as we prefer to sell rather than rent the home, we will hold open the option for another five days * * *." During the year 1944 six of the houses were sold by the Company. The houses built by the Company were of poor construction; substitute materials and untreated lumber being used; there was no steel mesh in the concrete slabs; galvanized wire instead of copper was used; plastic was used for trim and fixtures; and paint which was applied with spray guns peeled off in a few months, especially on the windward side. The Company had always shown an operating loss. In 1945 F.H.A. was urging that the houses be sold and on these instructions extensive and strenuous efforts were made by the petitioner to sell them. The local manager was offered a bonus on sales that he might make and the houses were advertised for sale. All kinds of inducements were made to get buyers. On July 2, 1945, letters were addressed to all tenants urging them to buy the houses and offering to give them the five per cent commission ordinarily paid to salesmen. This letter was followed up by a letter of July 29, 1945, again urging the tenants to buy the houses. All the tenants *265 were approached either by personal letters or interviews. A strenuous house-to-house sales effort was made in August, 1945. At a stockholders' meeting of the Company on August 26, 1945, petitioner, as president, reported that sales "had not materialized as expected"; that only 11 houses had been sold in spite of all the advertising effort that had been put forth; and, "that after more than two years of sales effort, less than ten per cent of the units had been sold." At a meeting of the stockholders on August 29, 1945, petitioner, as president, reported to the stockholders that sales were very slow and difficult and that there was no other alternative but to liquidate the corporation. Petitioner offered to take over the project, assume the liabilities and put the houses in condition as soon as possible. The transfer was thereafter made. In 1945 the corporation, of which petitioner was president, sold 22 houses. At the time the petitioner acquired the properties from the corporation he knew it was not a good rental project and that it had always lost money as such. He also knew that the properties were in bad condition and would require the expenditure of considerable funds to *266 put them in shape. At the time petitioner acquired those properties he had the thought in mind of selling the properties and reinvesting the proceeds in other property. He made an unsuccessful effort to sell on a wholesale basis. In 1946, after the veterans began to buy the houses with loans guaranteed by the Veterans Administration, petitioner made an effort to sell the houses to veterans. This effort was continued in 1947. Petitioner desired to sell the houses in order to be relieved of his liability under the mortgage. In the year 1946 petitioner sold 49 houses at Texas City at a gain of $110,400.17, less sales and advertising expense of $5,297.30, which amount he reported as a long-term capital gain in his income tax return filed for that year. Upon audit of the return respondent determined that the gain should be reported as ordinary income. In the year 1947 petitioner sold 49 houses at a gain of $135,911.03. The sales by petitioner in 1946 of the Texas City houses in question were made to customers in the ordinary course of his business. Opinion VAN FOSSAN, Judge: There is no doubt in our minds that the houses in question were originally built primarily for rental *267 purposes. This fact, however, is not an end of the matter. The basic question thus becomes, - did the corporation, of which petitioner was president, or the petitioner as an individual, after acquiring the properties in 1945, depart from the original purpose and hold the properties primarily for sale to customers? Each case of this character must turn on its own facts and, because of divergent facts, precedents are of little weight. Thus the cases of either similar F.H.A. projects, to which petitioner points, are all distinguishable on their facts. After a careful study of the record, particularly taxpayer's own testimony, and the letters written by the taxpayer as president of the Company, or as an individual after he took over the project, we are convinced that in 1946, when the sales in question were made, the property was "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." [1] It follows that the gain on the sales was taxable as ordinary gain and not as capital gain. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117 (b) and (j) (1), I.R.C.↩